**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mary Demetrulias,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Wal-Mart Stores Inc., a Delaware corporation; Claims Management Inc., an Arkansas corporation dba AR Claims Management Inc., dba Arkansas Claims Management Inc.; Wal-Mart Associates Inc., a Delaware corporation,<br><br>　　　　　Defendants. | No. CV-11-01407-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Defendants' Motion for Summary Judgment. For the reasons discussed below, the Motion is denied.[1]

## FACTUAL BACKGROUND

## I.    Parties and Initial Injury

Plaintiff Mary Demetrulias worked as a cashier for one of Defendant Wal-Mart Stores, Inc.'s ("Walmart") retail stores in Scottsdale, Arizona. (Doc. 111 ¶ 3; Doc. 117 ¶ 3.) While at work on March 6, 2010, Demetrulias stumbled over a rolled-up rug in a darkened back room and fell on her right side. (*Id.*) Demetrulias immediately reported the accident and injury to her Walmart manager. (Doc. 111 ¶ 4; Doc. 117 ¶ 4.) Her workers compensation form stated that Demetrulias suffered injuries to her right shoulder, back,

---

[1]    The Parties' requests for oral argument are denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

right side, and right knee. (Doc. 111-1, Ex. 4 at WMA 001665.)

She soon filed a workers compensation claim with Walmart. (Doc. 111 ¶ 5; Doc. 117 ¶ 5.) Arizona is one of a few states where Walmart self-insures for workers compensation. (Doc. 111 ¶ 1; Doc. 117 ¶ 1.) Defendant Claims Management Inc. (CMI), a Walmart subsidiary, handles adjustment of workers compensation claims in Arizona. (Doc. 111 ¶ 2; Doc. 117 ¶ 2.) A CMI employee by the name of Karen Person was the claims adjuster for Demetrulias over the relevant time period. (Doc. 111 ¶ 6; Doc. 117 ¶ 6.) Her direct supervisor was Leatta Wittaker, who in turn was supervised by Blynn Stewart. (Doc. 118-2, Ex. 102 (Stewart Dep.) at 17:17-18:17.) Person, Wittaker, and Stewart all worked on Demetrulias's file. These adjusters often consult nurse case managers ("NCMs") about medical questions, but the adjusters have the ultimate authority on claims decisions. (Doc. 119-1, Ex. 105 (Stephens Dep.) at 39:1-13.)

On March 7, 2010, Demetrulias was diagnosed by Dr. Gerald Yacobucci at the Orthopedic Clinic with post-traumatic impingement of the right shoulder with secondary adhesive capsulitis, and administered several injections for her pain. (Doc. 111 ¶¶ 8, 14; Doc. 117 ¶¶ 8, 14.) On April 12, 2010, he released Demetrulias back to "light duty" work with specific lift/push/pull imitations. (Doc. 111 ¶ 15; Doc. 117 ¶ 15.) Demetrulias began working again for Walmart at a position that largely entailed answering the phones. (Doc. 111 ¶ 16; Doc. 117 ¶ 16.) She worked in this capacity until June 20, when she left because of her condition. (Doc. 111 ¶ 17; Doc. 117 ¶ 17.)

## II.     Surgery, Delay, and Injury Expands to Wrist and Hand

On April 22, while Demetrulias was engaged in her light duty work, she complained to Dr. Yacobucci of "the recent onset of tingling and electrical sensation in the thumb, index, and middle finger of the right hand . . . [that] began during her therapy." (Doc. 111-3, Ex. 18 at WMA 000190.) Dr. Yacobucci recommended shoulder surgery and filed a request with CMI for approval that same day, although apparently not

with the adjuster assigned to Demetrulias. (Doc. 111-3, Ex. 18.)[2]

By May 7, neither Demetrulias nor her physician heard back from CMI. Demetrulias called CMI and told the adjuster that her surgery was supposed to take place on May 10, but that CMI had not yet given approval. (Doc. 111-2, Ex. 5 at WMA 001286.) She also sent a letter to CMI that stated she needed surgery "ASAP." (Doc. 117-1, Ex. 71.) Person, Demetrulias's claims adjuster, contacted Dr. Yacobucci's office about the shoulder surgery eighteen days later on May 25. (Doc. 111-2, Ex. 5 at WMA 0001284.) Person heard back from Dr. Yacobucci's office on June 3, and received the request form on June 8. (Doc. 111-2, Ex. 5 at WMA 0001284; Doc. 111 ¶ 27; Doc. 117 ¶ 27.) It was approved that day. (Doc. 111 ¶ 27; Doc. 117 ¶ 27.) Apparently, Dr. Yacobucci requested authorization by fax on May 11, May 20, and again on June 3, but sent that fax to the wrong adjuster. (Doc. 111-2, Ex. 5 at WMA 0001284; Doc. 117-1, Ex. 70.) Demetrulias eventually underwent the shoulder surgery on June 23, 2010, soon after she left her light duty work at Walmart. (Doc. 111 ¶ 28; Doc. 117 ¶ 28.) Nevertheless, Demetrulias testified that from April 22 to June 8, 2010, her physical pain was "off the charts." (Doc. 117-1, Ex. 64 (Demetrulias Dep.) at 119:4-122:8.)

Dr. Yacobucci had Demetrulias in for a follow-up visit on July 1. (Doc. 111 ¶ 29; Doc. 117 ¶ 29.) Demetrulias told Dr. Yacobucci that the tingling in her right hand and fingers was getting worse. (Doc. 111-3, Ex. 21 at WMA 000273.) He ordered an EMG, or nerve conduction study. (*Id.*) That request was denied on July 2 by Wittaker, Person's supervisor. (Doc. 111 ¶ 30; Doc. 117 ¶ 30; Doc. 119-1, Ex. 106 (Wittaker Dep.) 65:12-16.) Wittaker determined that the hand and wrist problem was a preexisting condition based on two pieces of evidence. (*Id.*) First, Demetrulias's medical records had listed "Carpal tunnel syndrome" as a condition she had some time earlier, although the file did not specify the hand or hands in which Demetrulias suffered the condition. (Doc. 111-3,

_____

[2] It appears that Demetrulias also had to obtain clearance from a cardiologist for the procedure, but there is evidence that the cardiologist sent clearance that same day, April 22. (Doc. 117-1, Ex. 69.)

Ex. 22 at WMA 000055-56.) Wittaker did not clarify that ambiguity. In fact, Demetrulias's previous carpal tunnel was in her left hand and arm. (Doc. 120-1, Ex. 114 ¶¶ 3-4.) Second, Wittaker stated that the initial March injury report did not mention any hand or wrist injuries, (Doc. 111-3, Ex. 23 (Wittaker Dep.) at 67:3-68:22), although the April 22 report from Dr. Yacobucci described "the recent onset of tingling and electrical sensation in the thumb, index, and middle finger of the right hand . . . [that] began during her therapy." (Doc. 111-3, Ex. 18 at WMA 000190.)

There was apparently some behind-the-scenes discussion between Person and a NCM named Jo Lynn Culppepper about Demetrulias's wrist injury. Culpepper contacted Demetrulias on July 14, and there was a back-and-forth about whether the hand and wrist issue was related to the March incident or was related to a previous wrist injury. (Doc. 111-2, Ex. 5 at WMA 001278.) Culpepper told Demetrulias to have Dr. Yacobucci call her during the next day's appointment to see whether there was a different diagnosis that would allow an EMG test. (*Id.*) Dr. Yacobucci called Culpepper the next day, and told her that Demetrulias was "considerably worse" than the last time he saw her. (*Id.*) Culpepper gave verbal authorization for a c-spine MRI and EMG. (*Id.*) Demetrulias had the EMG on July 21, 2010, twenty days after the initial request. (Doc. 111-3, Ex. 24 at WMA 000328.) The reported findings of the EMG were consistent with right carpal tunnel syndrome. (*Id.*)

Culpepper made the following notation in Demetrulias's file: "Because the file is taking a turn regarding affected body parts as well as [treatment], NCM recommends IME [independent medical examination]." (Doc. 111-2, Ex. 5 at WMA 001278.) Person formally requested an IME on July 19, 2010. (Doc. 111 ¶¶ 34-35; Doc. 117 ¶¶ 34-35.) On July 26, Stewart, one of Person's supervisors, reviewed Demetrulias's file. He noted that "NCM has recommended an IME to limit the extent of Injury. Depending on what the IME says, we will likely have a reserve change coming." (Doc. 111-2, Ex. 5 at WMA 001277.) With regard to the "limit the extent of Injury" comment, Stewart stated that he did not get a chance to "edit" the comment because he was "in a rush." (Doc. 118-2, Ex.

102 (Stewart Dep.) at 126:1-10.) In any event, the IME was scheduled for September 1. (Doc. 111 ¶ 29; Doc. 117 ¶ 29.)

All treatment was put on hold pending the IME. (Doc. 111-2, Ex. 5 at WMA 001276.) Dr. Yacobucci visited again with Demetrulias on July 29. (Doc. 112, Ex. 27 at WMA 000357.) Because previous efforts had failed to relieve the carpal tunnel pain, he recommended surgery. (*Id.*) In a letter to Walmart he wrote: "The carpal tunnel issue has already been addressed in a conservative fashion with cortisone instillation without improvement. At this point, it would be appropriate to move forward with definitive treatment in the form of a right wrist carpal tunnel release. We will begin the scheduling process today and obtain authorization from the carrier." (*Id.* at 000371.) CMI did not approve the referral because of the IME request and told this to Demetrulias. (Doc. 111-2, Ex. 5 at WMA 001276.) At another follow-up visit with Dr. Yacobucci on August 12, the doctor remarked that Demetrulias "has a diagnosis of carpal tunnel syndrome on the ride side which has failed conservative management and we are awaiting authorization to move forward with carpal tunnel release. The patient has a diagnosis of cervical spinal pathology which is currently being assessed by Dr. Levine via an IME." (Doc. 117-2, Ex. 75 at WMA 006208.)

The IME was performed by Dr. Levine on September 1, 2010. (Doc. 111 ¶ 42; Doc. 117 ¶ 42.) He determined that the carpal tunnel condition was work related and recommended wrist surgery. (*Id.*) CMI formally accepted the report on September 15. (Doc. 111-2, Ex. 5 at WMA 001273.) Meanwhile, Dr. Yacobucci noted on September 9 that Demetrulias's shoulder was "actually regressing" and that "[t]he problem, at this point, is that we are in a holding pattern, awaiting the opinion of the IME Specialist. The shoulder, however, does need continued ongoing care, otherwise, we are looking at a decrease in function and increasing pain." (Doc. 117-2, Ex. 77.) After CMI accepted the IME report on September 15, Dr. Yacobucci again requested wrist surgery. (Doc. 111 ¶¶ 43-44; Doc. 117 ¶¶ 43-44.) It was approved on September 16 (*id.*), and Demetrulias underwent the surgery on October 13, 2010 (Doc. 111 ¶ 48; Doc. 117 ¶ 48.)

### III. Delay in Receiving Catapres and Stellate Blocks

November 4 brought another follow-up visit with Dr. Yacobucci, who thought that Demetrulias's wrist was not looking good post-operation and required immediate physical therapy. (Doc. 117-2, Ex. 78.) CMI authorized eight physical therapy sessions on November 8, 2010. (Doc. 117-3, Ex. 80.) During her physical therapy sessions, Demtrulias's ability to move her hand began to diminish. (Doc. 112-2, Ex. 43 at 000104-05.) By November 16, Demetrulias's right hand began to swell and she had trouble moving her fingers. (Doc. 111 ¶¶ 49-50; Doc. 117 ¶¶ 49-50.) Dr. Yacobucci believed Demetrulias might be developing Complex Regional Pain Syndrome ("CRPS" or "RSD"), and referred her to Dr. Stephen Borowsky, a specialist. (Doc. 111 ¶¶ 50, 52; Doc. 117 ¶¶ 50, 52.) Dr. Yacobucci submitted preauthorization paperwork to CMI for the referral and for a stellate ganglion block to treat the CRPS. (Doc. 111 ¶ 52; Doc. 117 ¶ 52.) CMI denied the request on November 17 (Doc. 117-3, Ex. 81), but reversed and approved the first block the next day (Doc. 111 ¶ 53; Doc. 117 ¶ 53). It requested preauthorization paperwork for any subsequent treatment. (*Id.*)

Dr. Borowsky performed the first stellate block on November 24. (Doc. 111 ¶ 54; Doc. 117 ¶ 54.) To facilitate treatment, he prescribed a medication called Catapres, which operates to block the sympathetic nervous system. (Doc. 112-1, Ex. 37.) He prescribed Catapres "DAW," or "dispense as written" (Doc. 117-1, Ex. 65 (Borowsky Dep.) at 44:18-45:9), because the generic version was not as reliable in his experience (*Id*). Demetrulias took the prescription to Walmart that same day, but was told there was no authorization. (Doc. 120-1, Ex. 114 ¶ 11.) When Demetrulias contacted CMI, Person claimed that she did not know what was going on in the pharmacy. (Doc. 119-1, Ex. 104 (Person Dep.) at 119:3-123:20, 132:16-133:15.) Catapres showed up in the pharmacy as a smoking patch, which meant Person was unable to approve Catapres as "medical." (*Id.*) So she tried to get Dr. Borowsky to prescribe something else. (*Id.*) Dr. Borowsky wrote a letter to CMI chastising them for the apparent denial of coverage for Catapres: "Your failure to authorize Catapres presents an obstacle to treating a very difficult and possibly

disabling pain syndrome." (Doc. 112-1, Ex. 37.) In that same letter, Dr. Borowsky noted that "future stellate blocks are planned." (*Id.*)

When the request for more blocks was made and when Catapres was authorized is a matter of substantial dispute between the parties. Dr. Borowsky claimed that his office called for authorization on either November 24 or 29 (Thanksgiving was in the middle). (Doc. 117-1, Ex. 65 (Borowsky Dep.) at 32:16-33:12.) His practice with workers compensation cases is to have his secretary call the insurance company for authorization. (*Id.* at 102:25-104:17.) Person claims that she did not receive any written requests for blocks from Dr. Borowsky. (Doc. 111-1, Ex. 6 (Person Dep.) at 135:9-137:2.) However, written requests are not necessary; doctors could call and Person would fax an authorization form. (Doc. 111 ¶ 57; Doc. 117 ¶ 57.) CMI faxed Dr. Borowsky's office a preauthorization form on December 9, 2010. (Doc. 111 ¶ 58; Doc. 117 ¶ 58.) What Dr. Borowsky did with the December 9 form is unclear.

In the interim, Demetrulias called Person on November 29, and was told that Catapres had not yet been authorized and that authorization for the second stellate ganglion block was "pending." (Doc. 120-1, Ex. 114 ¶ 17.) Person asked for Dr. Borowsky to fax information on why the second block was needed and why generic medication was inappropriate. (Doc. 117-3, Ex. 82.) Demetrulias asked to speak to the higher authority, but was told simply that authorization was pending. (Doc. 120-1, Ex. 114 ¶ 20.) She eventually spoke with Stewart, who told her only that authorization takes time. (*Id.* ¶ 21.) Several more calls were placed to Person from November 29 to December 9, and Person said that approval was pending and she needed authorization from a higher authority. (*Id.* ¶ 19.)

Wittaker circulated the following email to two NCMs on December 9, the same day the preauthorization form was faxed to Dr. Borowsky: "HELP!!!!!!!!!!!!!!!!!!!! This is [Person]'s claim and we need help." (Doc. 112-3, Ex. 48.) She described the stellate block requests and then stated "I think we should get an Addendum IME to address the RSD/CRPS diagnosis and reign [sic] the medical back under control. Also should we be

paying for this anti hypertensive medication to treat the RSD? What are your recommendations? We need to know ASAP!" (*Id.*) The NCMs responded that "authorization was given once already for Stellate ganglion block for diagnosis RSD" and to seek an IME "to address if RSD is a true work injury." (*Id.*)

On December 15, Catapres and the second stellate block were approved. (Doc. 120-1, Ex. 114 ¶ 25.) Demetrulias filled the Catapres prescription on December 16 (Doc. 112-3, Ex. 49 at 22), and Dr. Borowsky administered the second stellate block on December 20 (Doc. 111 ¶ 66; Doc. 117 ¶ 66). Person claims that Catapres had been authorized since November 30. (Doc. 111-2, Ex. 6 (Person Dep.) at 125:9-14.) At some point after November 30, though, the pharmacy continued to refuse to dispense the medication (Doc. 111 ¶ 73; Doc. 117 ¶ 73), or filled it with a generic substitute (Doc. 111 ¶ 78; Doc. 117 ¶ 78).

There is evidence the delay in receiving the second stellate block and Catapres harmed Demetrulias. Dr. Borowsky testified: "From the fact that we could not reproduce any kind of noticeable improvement after the subsequent blocks compared to the first, that we had a good chance of getting this under much better control if we had been able to treat this aggressively in the beginning." (Doc. 117-1, Ex. 65 (Borowsky Dep.) at 46:17-47:9.) He concluded: "I don't know exactly what the result would have been, but the likelihood is that we would have had a much better situation than what we have." (*Id.* at 49:6-12.) Likewise, Demetrulias's hand doctor, Dr. Beth Purdy, testified that "I cannot say with 100 percent certainty . . . that getting that second block would . . . clearly have . . . offered her resolution, remission of this subsequent pain and disability. What I can say with medical probability, very confidently, is that getting . . . that block . . . within the next week or so after the first one would have offered her the best chance of being able to . . . see improvement." (Doc. 117-1, Ex. 66 (Purdy Dep.) at 114:10-25.) Dr. Purdy made similar statements regarding the Catapres delay: "I think . . . it offers the opportunity . . . for a better outcome. And obviously it doesn't offer a guarantee of a better outcome, but . . . I truly feel that it . . . contributed to the loss of opportunity that . . . this could have . . .

played out in a far more positive manner." (*Id.* at 115:1-20.) Demetrulias's expert testified that that "it is my opinion to a reasonable degree of medical probability that Demetrulias would have improved if she had gotten the second block earlier." (Doc. 119-1, Ex. 110 ¶ 4.)

## IV. Back and Forth

At any rate, subsequent stellate blocks were approved. Dr. Borowsky called Stewart, Person's supervisor, on April 11. (Doc. 111 ¶¶ 108-09; Doc. 117 ¶¶ 108-09.) In the course of their conversation, Stewart asked Dr. Borowsky some pointed questions, and Dr. Borowsky became angry. (*Id.*) Stewart told Dr. Borowsky that there was surveillance of Demetrulias pushing a shopping cart with both hands. (*Id.*) Borowsky asked to see the video. (*Id.*) In fact, there was no such video, but Stewart never called Dr. Borowsky back to correct his statement. (Doc. 111 ¶ 111; Doc. 117 ¶ 111.) Nevertheless, Stewart approved the treatment requested by Dr. Borowsky. (Doc. 111 ¶ 110; Doc. 117 ¶ 110.) He made a note that he approved two blocks "just so the patient will not have to wait four weeks to get approval for 2nd one." (Doc. 111-2, Ex. 5 at WMA 001324.) No alteration to Demetrulias's medical care was made based on the statements of Stewart regarding the surveillance. (Doc. 111 ¶ 114; Doc. 117 ¶ 114.)

Walmart has continued to provide coverage under workers compensation to Demetrulias for her claim. (Doc. 111 ¶ 144; Doc. 117 ¶ 144.) Behind the scenes, CMI uses a series of goals to help control costs. Its supervisors set monthly and annual goals to close workers compensation files. (Doc. 118-2, Ex. 102 (Stewart Dep.) at 95:11-96:12.) Supervisors like Stewart keep their teams appraised daily on achievements, or lack thereof. (*Id.*, Ex. 107 at 97:12-98:23.) This plan includes a "Blitz Wednesday," where extra effort is expended to close files. (*Id.*, Ex. 107 at 12:8-13:18.)

On June 15, 2011, Demetrulias filed suit against Walmart, CMI, and related entities in Maricopa County Superior Court. (Doc. 1-1.) Defendants removed this case to federal court on July 15. Demetrulias asserted claims for bad faith and intentional infliction of emotional distress. She further seeks punitive damages. After discovery

concluded, Defendants filed the instant Motion for Summary Judgment on July 27, 2012

**DISCUSSION**

## I.    Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248). When the nonmoving party "bear[s] the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The role of the judge is "not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Answering that question involves examination of "direct and circumstantial proof and the permissible inferences that may be drawn from such evidence." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

## II.    Analysis

### A.    Bad Faith

Demetrulias claims that Walmart's[3] handling of her workers compensation claim violated its duty of good faith and fair dealing. Under Arizona law, a workers

---

[3] For the sake of clarity, the Court refers to all Defendants collectively as "Walmart" in this section of the Order.

compensation claimant can bring an action against her employer's workers compensation insurer for breach of the duty of good faith and fair dealing. *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 149, 213 P.3d 288, 298 (Ct. App. 2009). The duty of good faith arises because "[a]n insurance contract is not an ordinary commercial bargain; implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) (internal quotation marks omitted). An insurance relationship carries some duties of a fiduciary nature. Among them are "[e]qual consideration, fairness and honesty." *Rawlings v. Apodaca*, 151 Ariz. 149, 155, 726 P.2d 565, 571 (1986). "[A]n insurer that intentionally and unreasonably denies or delays payment breaches the covenant of good faith owed to its insured." *Id.* at 156.

As an initial matter, Walmart's primary defense—that it ultimately paid on Demetrulias's claim—is unavailing. While a "typical" bad faith situation involves denial of benefits or coverage, see *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 507, 838 P.2d 1265, 1269 (1992) (citing cases examining failure to honor a claim), the Arizona Supreme Court has affirmed that delays in approval and actions taken while processing a claim can support a bad faith action. *See Zilisch*, 196 Ariz. at 238 (duty breached when insurer "intentionally denies, fails to process or pay a claim without a reasonable basis"); *Deese*, 172 Ariz. at 509 ("Plaintiff[ ] contends that State Farm acted unreasonably in the manner in which it processed her claim, without regard to its ultimate merits. State Farm's argument is that because it 'paid [the Plaintiff] all of the benefits that the contract provided, . . . [it] has not acted in bad faith towards her, regardless of how the decision was reached.' In fact, the finding of bad faith in this case is predicated precisely on the manner in which State Farm reached its decision.")

To aid in analyzing a bad faith insurance claim, Arizona employs a two-pronged test that has an objective and subjective component. First is the objective inquiry: did the insurer act unreasonably toward the insured? *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 164 Ariz. 256, 260, 92 P.2d 719, 723 (1990). Second is the subjective: did the

insurer act "knowingly or with reckless disregard as to the reasonableness of its actions"? *Id.*

Unreasonable actions include failure to "immediately conduct an adequate investigation," failure to "act promptly in paying a legitimate claim," "forc[ing] an insured to go through needless adversarial hoops to achieve its rights under the policy," "lowball[ing] claims," and similar conduct. *Zilisch*, 196 Ariz. at 238. The nature of the insurance relationship under Arizona law requires insurers to give "equal consideration" to the needs of their insureds and not treat the claims process as a battlefield. *Id.* Nevertheless, insurers can challenge claims that are "fairly debatable." *Id.* at 237.

As far as the subjective question of the insurer's intent goes, "[t]he 'intent' required here is an 'evil hand'—the intent to do the act. . . . [T]he insurer must intend the act or omission and must form that intent without reasonable or fairly debatable grounds. But an 'evil mind' is not required; the insurer need not intend to harm the insured." *Rawlings*, 151 Ariz. at 160. Intent is established if the insurer lacked a "founded belief" that its conduct was permissible. *Id.* "The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable." *Id.*

That means a bad faith plaintiff has to show something more than negligence to prevail. *Id.*; *see also Miel v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110, 912 P.2d 1333, 1339 (Ct. App. 1995) ("Mere mistake and inadvertence are not sufficient to establish a claim for bad faith."). After all, "[i]nsurance companies . . . are far from perfect. Papers get lost, telephone messages misplaced and claims ignored because paperwork was misfiled or improperly processed. Such isolated mischances may result in a claim being unpaid or delayed. None of these mistakes will ordinarily constitute a breach of the implied covenant of good faith." *Rawlings*, 151 Ariz. at 157.

"The appropriate inquiry [at this point] is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious

of the fact that its conduct was unreasonable." *Zilisch*, 196 Ariz. at 238. Typically, the insurer's belief in the fair debatability of a claim is "a question of fact to be determined by the jury." *Id.* at 237. Nevertheless, the plaintiff bears the ultimate burden at trial and must offer significantly probative evidence that calls into question the insurer's belief in the fair debatability of the claim. *See Knoell v. Metro. Life Ins. Co.,* 163 F. Supp. 2d 1072, 1077 (D. Ariz. 2001).

### 1.    Delay in Shoulder Surgery

The first example of alleged bad faith cited by Demetrulias is the delay between the request and authorization for the shoulder surgery. Dr. Yacobucci recommended that Demetrulias undergo surgery on April 22, 2010, but Walmart did not approve the surgery until June 8. Demetrulias has testified that she suffered extensive pain because of the delay, which leaves remaining the questions of the unreasonableness of the delay and whether Walmart acted knowingly in delaying approval for the shoulder surgery.

Demetrulias has presented some evidence that authorization was requested several times by Dr. Yacobucci's office from April 22 to June 3. (Doc. 117-1, Ex. 70.) The uncontroverted evidence presented by Walmart, however, is that Dr. Yacobucci had been faxing the surgery requests to the wrong office. (Doc. 111-2, Ex. 5 at WMA 0001284.) The first time Walmart contacted Dr. Yacobucci was on May 25, when Person called after hearing from Demetrulias that she was preparing to undergo shoulder surgery. (Doc. 111-2, Ex. 5 at WMA 0001284.) This May 25 phone call prompted another exchange between Person and Dr. Yacobucci that ultimately led to approval on June 8. (Doc. 111-2, Ex. 5 at WMA 0001284; Doc. 111 ¶ 27; Doc. 117 ¶ 27.)

While confusion existed, the only admissible evidence demonstrates that the source of the confusion was Dr. Yacobucci's office. As soon as the fax was sent to Person, the approval process went relatively smoothly. Walmart's conduct cannot be considered unreasonable; indeed, there is no evidence of neglect on its part. The delay in shoulder surgery does not support a bad faith claim.

## 2.    Initial Carpal Tunnel Denial

The next instance of delay was Walmart's initial refusal to cover the carpal tunnel injury. Dr. Yacobucci had requested an EMG on Demetrulias's hand and wrist on July 1, 2010, after learning that the tingling in Demetrulias's right hand and figures—which he first reported on April 22—had worsened. (Doc. 111-3, Ex. 21.) CMI supervisor Wittaker denied coverage on July 2 for two reasons: (1) Demetrulias's medical records had listed carpal tunnel syndrome as a previous condition and (2) there was no recent medical evidence of a hand or wrist problem. (Doc. 119-1, Ex. 106 (Wittaker Dep.) at 68:10-22.) It is undisputed that the earlier carpal tunnel injury was to the left hand, not the right (Doc. 120-1, Ex. 114 ¶¶ 3-4), and that Dr. Yacobucci had reported hand and wrist issues on April 22, about six weeks after the initial injury (Doc. 111-3, Ex. 18 at WMA 000190). The question, however, is not whether a jury could find that Wittaker's investigation was inaccurate, but that it was inadequate.

"[A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." *Lennar Corp. v. Transamerica Ins. Co.*, 227 Ariz. 238, 246, 256 P.3d 635, 643 (Ct. App. 2011) (quoting *Egan v. Mut. of Omaha Ins. Co.*, 620 P.2d 141, 146 (Cal. 1979)). Demetrulias has presented enough evidence to raise questions about the thoroughness of Wittaker's investigation. Demetrulias's medical records did not specify to which wrist the older carpal tunnel diagnosis applied. (Doc. 111-3, Ex. 22 at WMA 000055-56.) Walmart's expert stated that the duty to investigate would include determining whether the carpal tunnel injury was related to the right or left hand. (Doc. 120-1, Ex. 121 (McCoy Dep.) at 95:1-10.) Moreover, even if the injury was to the left hand, Arizona law recognizes that subsequent workplace injuries can aggravate pre-existing injuries, and coverage for that aggravated injury properly lies with the workers compensation insurer. *See Indus. Indemnity Co. v. Indus. Comm'n of Ariz.*, 152 Ariz. 195, 199, 731 P.2d 90, 94 (Ct. App. 1986).

Furthermore, there is evidence that Wittaker's examination of the medical records

themselves was deficient. She claims that she examined the medical records and did not see any injuries to the hand or wrist. Doc. 119-1, Ex. 106 (Wittaker Dep.) at 68:10-22.) But Walmart had Dr. Yacobucci's April 22 report where he noted that Demetrulias complained of "the recent onset of tingling and electrical sensation in the thumb, index, and middle finger of the right hand. She states this began during her therapy." (Doc. 111-3, Ex. 18 at WMA 000190.) Viewed as a whole, Demetrulias has presented enough evidence to raise issues of fact as to whether Wittaker's conduct was unreasonable.

She must also show that Walmart employees were not merely negligent, but knew their conduct was unreasonable. Arizona courts describe this element as lacking a "founded belief" in the propriety of a course of action. Specifically, a founded belief can be absent "when the insurer either knows that its position is groundless or *when it fails to undertake an investigation adequate to determine whether its position is tenable*." 151 Ariz. at 160 (emphasis added). A failure to investigate theory may result in some overlap in the first two elements of the bad faith analysis. Thus where a plaintiff proceeds on the theory that her claim was denied or delayed because the insurer failed to adequately investigate her claim, the evidence may support both the objective unreasonableness of the insurer's actions and also the existence of the subjective "evil hand." Consequently, there is sufficient evidence that the denial of coverage for carpal tunnel syndrome was in bad faith.

### 3. IME Request

Demetrulias cites the Summer 2010 IME request made by Walmart as further evidence of bad faith. The day that authorization was given to Dr. Yacobucci to proceed with the EMG on Demetrulias's hand and wrist, Nurse Culpepper recommended an IME. (Doc. 11-2, Ex. 5 at WMA 001278.) Person requested the IME on July 19, 2010 (Doc. 111 ¶¶ 34-35; Doc. 117 ¶¶ 34-35), and it was scheduled for September 1, 2010 (Doc. 111 ¶ 42; Doc. 117 ¶ 42). An insurer is "entitled to seek an independent medical examination" to ensure further medical treatment is necessary. *Mendoza*, 222 Ariz. at 159. However, "it may not use the process to breach the implied covenant of good faith and fair dealing."

*Bennett v. Ins. Co. of State of Penn.*, No. 1 CA–CV 10–0815 2012 WL 424913 at *3 (Ariz. Ct. App. Feb. 9, 2012).

The parties dispute the justification for the IME. Walmart claims the IME was ordered because medical treatment was expanding beyond the shoulder and back injuries to the hand and wrist. Using the IME in this way would be permissible. On the other hand, Stewart, one of the adjusters, stated in the claim notes that the IME's purpose was "to limit the extent of the injury." (Doc. 111-2, Ex. 5 at WMA 001277.) When pressed at deposition about the meaning of this comment, Stewart stated that he regretted being unable to "edit" the comment out because he was "in a rush." (Doc. 118-2, Ex. 102 (Stewart Dep.) at 126:1-10.) Using the IME as a claim-trimmer is not permissible. *See Mendoza*, 222 Ariz. at 159 ("McDonald's claim file reflects it sought independent medical examinations for the purpose of 'cutting' or closing Mendoza's claim. Although McDonald's workers' compensation expert witness testified references to cutting or closing claims were simply 'jargon,' and referred to acceptable goals of processing workers' compensation claims, a jury could certainly conclude otherwise.")

Here the evidence could support both a finding of unreasonable conduct and an "evil hand." Using an IME to "limit the extent of the injury" could show that Walmart "inten[ded] the act or omission and . . . form[ed] that intent without reasonable or fairly debatable grounds." *Rawlings*, 151 Ariz. at 160. Because a reasonable jury could credit the explanation of either Walmart or Demetrulias, Demetrulias can also use the IME denials to support her bad faith claim.

### 4.    CRPS and Catapres Delays

Demetrulias next relies on the delay in getting approval for CRPS stellate block treatments and her Catapres medication during November and December of 2010. The timeline is unclear as the parties vigorously dispute how the authorization for CRPS treatment proceeded. Walmart asserts that Dr. Borowsky did not formally request the second stellate block treatment until around December 9 (Doc. 111 ¶ 58; Doc. 117 ¶ 58), and approval was granted on December 15 (Doc. 120-1, Ex. 114 ¶ 25). It also claims that

Catapres was available to Demetrulias as of November 30. (Doc. 111-2, Ex. 6 (Person Dep.) at 125:9-14.) In contrast, Demetrulias has evidence that Dr. Borowsky requested the second block as early as November 24 or 29 (Doc. 117-1, Ex. 65 (Borowsky Dep.) at 32:16-33:12), and that she was continually told authorization was pending over the next two weeks (Doc. 120-1, Ex. 114 ¶¶ 19-21). She also asserts that Catapres was not approved until December 15, and that it was dispensed as a generic, in contravention of Dr. Borowsky's prescription. (*Id.* ¶ 25; Doc. 112-1, Ex. 37; (Doc. 117-1, Ex. 65 (Borowsky Dep.) at 44:18-45:9.) Demetrulias has presented evidence that her doctors conveyed to Walmart the urgent need for rapid authorization of Catapres and successive stellate block treatments to address CRPS.

In light of the conflicting evidence, the Court must view the facts in the light most favorable to Demetrulias, the nonmoving party. Assuming that CMI delayed approval from November 24 or 29 until December 15 and failed to provide updates, despite the sense of urgency conveyed by Demetrulias and her doctors, that delay could constitute bad faith. Evidence that an insurer failed to "act promptly in paying a legitimate claim" is evidence of objectively unreasonable conduct. *Zilisch*, 196 Ariz. at 238.

Demetrulias has also presented evidence that Walmart was intentionally dragging its feet, which satisfies the second prong of the bad faith test. Walmart's IME had determined that the right carpal tunnel injury was work related and that treatment was necessary. (Doc. 111 ¶ 42; Doc. 117 ¶ 42.) Treatment of the right carpal tunnel injury is what led to the discovery of the CRPS. But Demetrulias points to an email from Wittaker on December 9th to two nurses that suggests Walmart nevertheless sought to avoid paying for the stellate block treatments and the medication: "HELP!!!!!!!!!!!!!!!!!!! This is Karen[ Person]'s claim and we need help. . . . I think we should get an Addendum IME to address the RSD/CRPS diagnosis and *reign* [sic] *the medical back under control*. Also should we be paying for this anti hypertensive medication to treat the RSD? What are your recommendations? We need to know ASAP!" (Doc. 112-3, Ex. 48) (emphasis added). This comment raises an issue of fact as to the motivations behind the delay in

approval for treatment, thus necessitating trial on the issue of Walmart's handling of the CRPS claim.

### 5.      Stewart's Surveillance Claim to Dr. Borowsky

Demetrulias also relies on the comments made by Stewart to Dr. Borowsky in an April 2011 conversation. In that conversation, Stewart told Dr. Borowsky that there are doctors who believe CRPS was not a real condition, which would explain why Walmart "ha[s] gone this far fighting about this." (Doc. 118-2, Ex. 102 (Stewart Dep.) at 168:5-15.) He then claimed that Walmart had surveillance video of Demetrulias pushing a shopping cart with both hands. (Doc. 111 ¶¶ 108-09; Doc. 117 ¶¶ 108-09.) That statement was false—no such video existed. (Doc. 118-2, Ex. 102 (Stewart Dep.) at 170:15-171:20.) Stewart claims that he had mixed up several conversations in his mind, including one with Demetrulias's store manager, which led to the claim. (*Id.*) He did not call back to correct his mistake. (*Id.*) The entire conversation upset Dr. Borowsky greatly, made Demetrulias cry, and caused her to worry that Dr. Borowsky would no longer treat her. (Doc. 117-1, Ex. 64 (Demetrulias Dep.) at 270:25-273:20.) Nevertheless, Dr. Borowsky continued to treat Demetrulias as before, and no alterations in her treatment occurred. (Doc. 111 ¶¶ 112, 114; Doc. 117 ¶¶ 112, 114.) In fact, Stewart approved all of the treatment requested by Dr. Borowsky. (Doc. 111 ¶ 110; Doc. 117 ¶ 110.)

When an insurer makes a false statement to a treating doctor, there is a question whether the purpose of such a statement would be to reduce treatment in contravention of the evidence before both the doctor and insurer. While Stewart has attributed his statement to a mix-up from conversations with other Walmart employees, a jury could reasonably find otherwise. First, Stewart never called Dr. Borowsky back to correct his mistake. Second, Wright, Demetrulias's store manager and the potential source for the surveillance claim, denies telling Stewart that he saw Demetrulias using both of her hands. (Doc. 119-1, Ex. 111 (Wright Dep.) at 74:21-80:16.) Whether the statement was an honest mistake or an intentional falsehood is not for the Court to decide at this phase. The issue presented is for the jury to resolve.

### 6.    Walmart Policies and Procedures

Demetrulias finally contends that all of these actions by Walmart, while independently examples of bad faith, are informed by Walmart claims management practices and policies. Now, "[t]he evolution of the law of bad faith has not reached the point where it is wrong for an insurance company to make a profit, much less follow good business practices." *Knoell*, 163 F. Supp. 2d at 1078. "For instance, . . . a company keeping statistics on resolution of claims and looking to their 'bottom line' are reasonable internal procedures." *Id*. But setting *arbitrary* goals for reduction in claims paid or linking salaries and bonuses to claim payouts can be unreasonable. *Zilisch*, 196 Ariz. at 238 (finding that such practices provided "evidence . . . from which a jury could find that State Farm acted unreasonably and knew it").

Here, the effect of the policies on Walmart's claims processing is an issue of fact inappropriate for summary judgment. A jury could find that the goals set by Walmart were arbitrary and placed unreasonable pressure on employees to deny claims. Its supervisors set monthly and annual goals to close workers compensation files. (Doc. 118-2, Ex. 102 (Stewart Dep.) at 95:11-96:12.) A typical goal appears to be "100 percent," or to close the same number of claims that are opened. (*Id.*) Stewart constantly kept his team informed on where they were in relation to the 100% goal. (*Id.* at 97:12-98:23.) This plan included a "Blitz Wednesday" toward the end of the month, where extra effort is expended to close files. (Doc. 119-1, Ex. 107 at 12:8-13:18.) Walmart has not shown that such a goal reflects reality, namely that each month the number of claims that come in and the number of claims where medical evidence justifies closure are equivalent. This situation is similar to *Zilisch*, where the Arizona Supreme Court held that a jury could reasonably find arbitrary goals as evidence of bad faith. So may Demetrulias here.

Demetrulias also discusses the Walmart policy of "roundtabling" difficult claims, and contests that this policy also amounts to bad faith. Person and Stewart both testified, however, that her claim was not roundtabled. (Doc. 111 ¶¶ 135-36; Doc. 117 ¶¶ 135-36.) Demetrulias relies on the testimony of her expert that, since similar claims are

roundtabled, Demetrulias's must have been. (Doc. 117 ¶ 387.) "Expert witnesses may testify if they are qualified and if their testimony will assist the trier of fact in understanding the evidence or determining a fact in issue." *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985) *overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir.1997) (en banc). Demetrulias's expert does not use "scientific, technical, or other specialized knowledge", Fed. R. Evid. 702(a), to refute the testimony of Person and Stewart. He instead gives his opinion that Demetrulias's claim fits Walmart's definition of a high dollar claim and therefore was likely roundtabled in accordance with Walmart's practice of roundtabling high dollar claims (Doc. 117 ¶ 387). Such speculation about how Walmart classifies claims is improper expert testimony. There is no evidence that Demetrulias's expert has advanced knowledge beyond that of a jury in evaluating the meaning of Walmart's policies, which makes his testimony unhelpful under Rule 702. Demetrulias offers nothing more than the fact that Walmart roundtables high dollar claims and that her expert thinks her claim would fit that description. Such speculation is insufficient to create a genuine issue of material fact in light of the clear testimony of Stewart and Person. Accordingly, Demetrulias cannot incorporate the roundtable policy into her bad faith claim.

### 7. Independent Injury

Demetrulias has presented evidence that Walmart acted in bad faith while handling her claim. But an element of bad faith, like any other tort, is causation and damages. Walmart vigorously contends that Demetrulias cannot show injury separate from the ultimate injury that Walmart covered. Looking at the evidence presented by Demetrulias as a whole, there is sufficient evidence to create an issue of fact whether the actions of Walmart employees and the concomitant delays in obtaining medical procedures caused Demetrulias physical and mental injury. For example, during the summer and fall of 2010, while delays occurred due to the initial denial for carpal tunnel and wait for the IME, Dr. Yacobucci noted that her shoulder was "regressing" and there was "a decrease in function and increasing pain." (Doc. 117-2, Ex. 77.) Demetrulias has

also presented evidence that the delays in receiving the second stellate block and Catapres likely worsened her chances of recovery. (Doc. 117-1, Ex. 65 (Borowsky Dep.) at 46:17-47:9; Doc. 117-1, Ex. 66 (Purdy Dep.) at 114:10-25; Doc. 119-1, Ex. 110.) In addition, Demetrulias has testified of her own physical pain and emotional suffering as a result of these delays. (Doc. 117-1, Ex. 64 (Demetrulias Dep.) at 119:4-122:8, 160:25-167:2, 256:25-257:7.) That evidence is sufficient to defeat a motion for summary judgment.

Demetrulias has carried her burden under Rule 56 to defeat Walmart's Motion for Summary Judgment and proceed to trial on the bad faith claim.

### B.    Punitive Damages

Punitive damages are available in a bad faith insurance action when there are "'circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton.'" *Rawlings*, 151 Ariz. at 162 (quoting W. Prosser & W. Keeton, *Law of Torts* § 2 at 9-10 (5th ed. 1984)). This time, there must an "evil mind" guiding the "evil hand." *Id.* Needless to say, "this remedy is only to be awarded in the most egregious of cases, where there is reprehensible conduct combined with an evil mind over and above that required for commission of a tort." *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986).

Summary judgment on the question of punitive damages is inappropriate if "a reasonable jury could find the requisite evil mind by clear and convincing evidence." *Thompson v. Better-Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992). The evil mind can be shown by some combination of "evil actions", "spiteful motives", or "outrageous, oppressive or intolerable conduct that creates a substantial risk of tremendous harm to others." *Volz v. Coleman Co., Inc.,* 155 Ariz. 567, 570, 748 P.2d 1191, 1194 (1987). Put another way, the court considers "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred[,] . . . [t]he duration of the misconduct, the

degree of defendant's awareness of the harm or risk of harm, and any concealment of it." *Thompson*, 171 Ariz. at 556. The primary question where punitive damages have been requested is motive, because gross negligence and reckless disregard are not enough. *Volz*, 155 Ariz. at 570-71. Because a defendant rarely admits to an "evil mind," improper motive is often inferred from sufficiently oppressive, outrageous, or intolerable conduct. *Id.* at 162-63; *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 498, 733 P.2d 1073, 1081 (1987).

Demetrulias relies on the same actions by Walmart that supported her bad faith claim to support her claim for punitive damages. She relies in particular on the statements by Stewart to Dr. Borowsky about surveillance and claims those statements were intentional false statements that demonstrate spite and oppressiveness. As discussed above, a jury could find that Stewart intentionally made false statements to Dr. Borowsky regarding the existence of surveillance tape and incorporate those statements in a larger picture of bad faith. If the jury so finds, the Court cannot then say that no reasonable jury would also find that conduct outrageous and intolerable. Such deliberate interference by the insurer in the doctor-patient relationship, if it occurred, could create a "substantial risk of harm" for Demetrulias. It is the defendant's motive in the face of a serious risk of harm that justifies punitive damages. While Stewart actually approved the treatment for Demetrulias shortly after his conversation with Dr. Borowsky, the purpose of punitive damages is to punish and deter outrageous conduct rather than to directly compensate for harm suffered. *See Volz*, 155 Ariz. at 570 ("Punitive damages are awarded in order to punish the wrongdoer and deter others from emulating the same conduct.") The inquiry therefore focuses on the motives of the defendant and how those motives accentuate the *risk* of harm. Stewart's comments are evidence that could support a finding of punitive damages.

In addition, a jury could find in the evidence presented by Demetrulias a pattern or practice of Walmart deliberately dragging its feet in the face of statements by Demetrulias, her physicians, and Walmart's own IME that Demetrulias had real injuries

that needed immediate treatment. Comments by Walmart adjusters that they needed to use their policies to "limit the extent of the injury" and "reign [sic] the medical back under control" in the face of statements by doctors that rapid treatment was necessary could provide a basis for finding the delays were "'motivated by spite, actual malice, or intent to defraud' or by a 'conscious and deliberate disregard for the interests and rights of" Demetrulias. *Quintero v. Rogers*, 221 Ariz. 536, 541, 212 P.3d 874, 879 (Ct. App. 2009). As it stands at the summary judgment stage, there is sufficient evidence before the Court on which a jury could award punitive damages by clear and convincing evidence. Summary judgment for Walmart is therefore inappropriate.

### C.  Intentional Infliction of Emotional Distress

Walmart has also moved for summary judgment on Demetrulias's claim of intentional infliction of emotional distress (IIED). Demetrulias asserts that the same conduct that supported her bad faith claim also supports the IIED claim. Three elements make up an IIED claim: "[F]irst, the conduct by the defendant must be 'extreme' and 'outrageous'; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987) (citing *Restatement (Second) of Torts* § 46(1) (1965)). The adjectives "extreme" and "outrageous" are not just for show; evidence of callousness or insensitivity will not suffice. *See Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 555, 905 P.2d 559, 564 (Ct. App. 1995). The plaintiff must show that the defendant's acts were "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 554. The question of whether the acts complained of by a plaintiff are sufficiently extreme or outrageous is answered by the court. *See Patton v. First Fed. Sav. & Loan Ass'n of Phoenix*, 118 Ariz. 473, 476, 578 P.2d 152, 155 (1978).

Defendants have only challenged Demetrulias's claim that their actions were

outrageous; its Motion does not address the other elements of an IIED claim, and so the Court limits its examination to that issue. While the standards for punitive damages and IIED claims both use the term "outrageous" to describe the type of conduct that falls within their ambit, an examination of the cases reveals that IIED claims require an even higher level of outrageousness than those where punitive damages have been approved. There can thus be facts that support punitive damages but not an IIED claim. Cases where there has been a sufficient finding of outrageousness contain stark and repulsive facts that strike at very personal matters, such as willful ignorance of rampant sexual harassment, *Ford*, 153 Ariz. at 39-42, *Coffin v. Safeway, Inc.*, 323 F. Supp. 2d 997, 1005-06, a doctor who hid the reason for an infant's death from its mother, *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 149 Ariz. 76, 79-81, 716 P.2d 1013, 1016-18 (1986), or conspiracy to hide a child from a father, *Pankratz v. Willis*, 155 Ariz. 8, 744 P.2d 1182 (Ct. App. 1987).

The doctor-patient relationship is a very personal matter. If a jury found that Stewart lied to Dr. Borowsky in an attempt to influence the care Dr. Borowsky was providing to his patient, it could also find that such conduct rises to the level of outrageousness necessary for an IIED claim. This stems from the existence of a "special relationship" between an insurer and the insured. *Rowland v. Great States Ins. Co.*, 199 Ariz. 577, 586, 20 P.3d 1158, 1167 (Ct. App. 2001) (recognizing the existence of the "special relationship"). The existence of that relationship means that the level of outrageousness necessary to succeed on an IIED claim is lessened. Recognizing, as Arizona courts have, the unique relationship between an insured and her insurer, a jury could find that exploitation of that power relationship for purposes of financial gain was outrageous, for largely the same reasons discussed in the section on punitive damages. Enough evidence is before the Court to allow a jury to make that determination. Consequently, summary judgment for Walmart on the IIED claim is denied.

## CONCLUSION

Demetrulias has produced evidence that Walmart, in a series of actions, acted with bad faith in administering her claim. She has also presented evidence sufficient to get to the jury on her IIED claim and request for punitive damages.

**IT IS THEREFORE ORDERED** that Walmart's Motion for Summary Judgment (Doc. 110) is **DENIED.**

Dated this 10th day of January, 2013.

G. Murray Snow
United States District Judge